**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-1374
_____

DALILA AVILA,
                                        Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES
OF AMERICA

_____

On Petition for Review of a Final Order of the
Board of Immigration Appeals
No. A047-832-804
Immigration Judge: Dinesh C. Verma
_____

Argued: December 14, 2022

Before:   RESTREPO, MCKEE, and SMITH, *Circuit Judges*.

(Opinion filed: September 14, 2023)

Kaley J. Miller-Schaeffer **[Argued]**
Theodore J. Murphy
Murphy Law Firm
320 N High Street
West Chester, PA 19380
      *Counsel for Petitioner*

Dana M. Camilleri **[Argued]**
Merrick B. Garland
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
      *Counsel for Respondent*

———————

OPINION OF THE COURT

———————

McKEE, *Circuit Judge*.

Dalila Avila petitions for review of a decision of the Board of Immigration finding her ineligible for cancellation of removal pursuant to 8 U.S.C. § 1229b(a), and dismissing her application for asylum. We will deny the petition for review as to the BIA's decision that Avila was ineligible for cancellation of removal, and remand to the BIA on Avila's asylum claim.

As to cancellation of removal, Avila challenges the BIA's conclusion that her conviction for a disorderly persons offense under New Jersey law constitutes a conviction under 8 U.S.C. § 1101(a)(48)(A) and therefore constitutes a crime under § 1227(a)(2)(A)(ii). While Avila's petition for review was pending with this Court, the BIA issued a precedential decision in *Matter of S. Wong*,[1] holding that disorderly persons offenses under section 2C:20-4(a) of the New Jersey Statutes constitute convictions of crimes for immigration purposes.

———————

[1] 28 I. & N. Dec. 518, 525 (BIA 2022).

2

Avila argues that this decision is not entitled to *Chevron* deference. We must reject this argument.

As to Avila's asylum claim, Avila argues that the BIA failed to consider whether Avila's particular social group (PSG) was cognizable in light of the specific country conditions in Honduras. We agree and will grant Avila's petition for reconsideration of her PSG.

## I.

Dalila Avila is a native and citizen of Honduras.[2] Her life in Honduras was punctuated by sexual violence. At seven, Avila was tied up and raped repeatedly at knifepoint by a stranger, who left her bleeding in the street.[3] When Avila was a teenager, she was gang raped by eight of her cousins, one of whom threatened to kill her father if she reported the rape.[4] At 18, Avila was raped again.[5] As a result of this rape, she became pregnant with—and gave birth to—her oldest child.[6] And as a young adult, Avila was in a relationship with a man who beat her, slapped her, kicked her, and threatened her with a gun.[7] On one occasion, he beat her with a pistol so severely that she miscarried.[8] Believing "men only want[ed] to hurt her," Avila attempted suicide more than once.[9]

Avila fled Honduras. She became a lawful permanent resident in 2001.[10] Between 1990 and 2004, she was convicted of misdemeanor shoplifting in violation of NJSA § 2C:10-11; misdemeanor tampering with public records in violation of NJSA § 2C:28- 7A(1); and petty theft in violation of CPSC § 02:484(A).[11] On December 16, 2008, Avila re-entered the United States where she requested admission as a returning

---

[2] **A.R. 335.**
[3] **A.R. 115, 123.**
[4] **A.R. 115.**
[5] **A.R. 152.**
[6] **A.R. 152.**
[7] **A.R. 156.**
[8] **A.R. 931.**
[9] A.R. 152, **156.**
[10] **A.R. 1116.**
[11] **A.R. 537, 577–85, 1116–17.**

lawful permanent resident.[12] The Department of Homeland Security served her with a Notice to Appear charging her with removability under the Immigration and Nationality Act (INA) § 212(a)(2)(A)(i)(I), 8 U.S.C. § 1182(a)(2)(A)(i)(I), because her convictions were for "Crimes Involving Moral Turpitude."[13] Avila failed to attend her scheduled hearing and on March 21, 2011, she was ordered removed *in absentia*.[14] In March 2015, her proceeding was reopened.[15]

On November 22, 2016, Avila filed a Motion to Terminate her removal proceedings.[16] Avila conceded that her petty theft offense was a crime involving moral turpitude (CIMT) but argued that she could avoid a finding of inadmissibility because this conviction fell under the petty offense exception in INA § 212(a)(2)(A)(ii), 8 U.S.C. §1182(a)(2)(A)(ii).[17] This exception applies to a noncitizen "who committed *only one* crime," where "the maximum penalty possible for the crime . . . did not exceed imprisonment for one year," and the noncitizen "was not sentenced to a term. . . in excess of 6 months."[18] Although Avila admitted that she had two other convictions—misdemeanor shoplifting and tampering with public records—she argued that pursuant to our reasoning in *Castillo v. Attorney General*,[19] those convictions did not disqualify her from the petty offense exception because they did not qualify as "crimes."[20] Rather, she contended that they were merely disorderly persons offenses under New Jersey law that did not rise to the level of "criminal convictions" under the INA, and therefore, could not sustain her charge of removability under INA § 212(a)(2)(A)(i)(I).[21]

---

[12] **A.R. 2, 1116.**

[13] **A.R. 1116–17.**

[14] **A.R. at 180–81, 1059.**

[15] **A.R. 115, 624.**

[16] **A.R. 115, 468–70.**

[17] **A.R. 470.**

[18] INA § 212(a)(2)(A)(ii), 8 U.S.C. § 1182(a)(2)(A)(ii) (emphasis added).

[19] 729 F.3d 296 (3d Cir. 2013).

[20] A.R. 470.

[21] *Id.*, **473.**

On November 14, 2018, the IJ determined that Avila was not eligible for cancellation of removal as a lawful permanent resident.[22] The IJ relied upon our decision in *Castillo* to conclude that the disorderly persons offenses were convictions of crimes for immigration purposes.[23] *Castillo* relied in part upon the Board's construction of § 1101(a)(48)(A) in *In re Eslamizar*,[24] which required the decision-maker to conduct an "open-ended inquiry." That inquiry must consider various factors to determine if the disputed judgment of guilt "was entered in a true or genuine criminal proceeding."[25] Having concluded that Avila's disorderly persons offenses were entered in a "genuine criminal proceeding," and thus were criminal convictions, the IJ determined that each offense was a CIMT.[26] Accordingly, the IJ held that because Avila had more than one CIMT, her California petty theft offense did not qualify for the petty theft exception, and she was not eligible for cancellation of removal.[27]

---

[22] **A.R. 147–174.** Pursuant to 8 U. S. C. § 1229b(a), the Attorney General may cancel the removal of a noncitizen who has "resided in the United States continuously for 7 years after having been admitted in any status." Continuous residence, however, ends when the noncitizen "has committed an offense referred to in section 1182(a)(2) [i.e., a crime involving moral turpitude] that renders the [noncitizen] . . . removable from the United States under section 1227(a)(2) . . . of this title." 8 U.S.C. § 1229b(d)(1). This is referred to as the "stop-time rule" because a noncitizen's commission of a crime involving moral turpitude stops their period of continuous residence for purposes of cancellation of removal. *Khan v. Att'y Gen.*, 979 F.3d 193, 196 (3d Cir. 2020).

The IJ also determined that Avila was not eligible for a waiver of inadmissibility under INA § 212(h), withholding of removal, or CAT protection. **A.R. 135–42.**

[23] **A.R. 115, 128–31.**

[24] 23 I. & N. Dec. 684 (BIA 2004) (en banc).

[25] *Castillo*, 729 F.3d at 307.

[26] **A.R. 131.**

[27] **A.R. 133.** The IJ concluded that because Avila's petty theft offense did not qualify for the petty theft exception, it

With respect to Avila's asylum application, the IJ found Avila's testimony credible, explaining that her testimony was "candid[]" and "consistent[]."[28] The IJ also found that the "rapes and beatings" Avila suffered in her "domestic and familial relationships" were "grievous harms" that rose to the level of past persecution."[29] Nonetheless, the IJ concluded that "despite [Avila's] lifetime of abuse and victimization," she had not established that any such persecution was on account of a protected ground. The IJ concluded that "Honduran women in a domestic relationship where the male believes that women are to live under male domination" was not a cognizable particular social group.[30] In reaching this conclusion, the IJ relied on the Attorney General's decision in *Matter of A-B-* (*A-B-I*),[31] which overruled *Matter of A-R-C-G-*,[32] a decision holding that "married women in Guatemala who are unable to leave their relationship" constituted a particular social group.[33] Because Avila contended that her social group was "essentially the same" as that recognized in *Matter of A-R-C-G-*, which had been rejected in *A-B-I*, the IJ determined that Avila was ineligible for asylum.[34]

The BIA dismissed Avila's appeal, largely for the reasons set forth by the IJ.[35] The BIA affirmed the IJ's determination that Avila's tampering with public records was a conviction under INA § 101(a)(48)(A), 8 U.S.C. § l101(a)(48)(A). Since this meant that Avila had "sustained

---

triggered the "stop time" rule under INA § 240A(d)(l) and terminated her period of continuous residence. *Id.*

[28] A.R. 136. Prior to the IJ's decision as to Avila's asylum claim, the IJ determined that Avila's felony conviction out of Delaware, for which she had received a gubernatorial pardon, was not an aggravated felony and therefore, she could pursue her asylum claim. **A.R. 395-402.**

[29] A.R. 137.

[30] A.R. 137.

[31] 27 I. & N. Dec. 316 (A.G. 2018).

[32] 26 I. & N. Dec. 388 (BIA 2014).

[33] **A.R. 137**.

[34] *Id.*

[35] **App. 34.**

more than one CIMT," the petty offense exception was unavailable to her.[36]

The BIA also affirmed the IJ's determination that Avila was ineligible for asylum.[37] In reaching this conclusion, the Board reasoned that Avila's "particular social group" lacked "particularity" because it was "impermissibly defined with amorphous and overbroad terms."[38] The BIA also concluded that the proposed social group did not "exist independently" of the harm alleged, as required under *Matter of M-E-V-G-*[39] and *Matter of W-G-R-*.[40] The BIA explained that it did not base its decision to deny Avila's asylum claim on the Attorney General's decision in *Matter of A-B-I*, because it had been vacated in 2021.[41]

Avila filed a petition for review with this Court on March 1, 2022.[42]

II.

We have jurisdiction pursuant to 8 U.S.C. § 1252. This Court reviews the BIA's legal determinations de novo, "subject to the principles of deference articulated in" *Chevron U.S.A., Inc. v. NRDC*.[43] Under this doctrine, the Court, as well as the

---

[36] App. 37 (citing *Matter of Garcia*, 25 I & N Dec. 332, 335–36 (BIA 2010); *Matter of Jurado-Delgado*, 24 I & N Dec. 29, 34 (BIA 2006)). The BIA declined to reach the issue of whether Avila's shoplifting conviction was a conviction of a crime for immigration purposes because it concluded that her conviction for tampering with public records was a conviction for immigration purposes. ***See* App. 35 n. 5.**

[37] A.R. 7–8.

[38] A.R. 7 (citing *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 239-40 (BIA 2014); *Matter of W-G-R-*, 26 I. & N. Dec. 208, 213-14 (BIA 2014); *Chavez-Chillel v. Att'y Gen.*, 20 F. 4th 138, 146 (3d Cir. 2021).

[39] *Matter of M-E-V-G-*, 26 I. & N. Dec. at 237 n. 11.

[40] *Matter of W-G-R-*, 26 I. & N. Dec. at 215.

[41] **A.R. 7–8 n. 10.** *Matter of A-B-*, 28 I. & N. Dec. 307, 308 (A.G. 2021) (*A-B-III*) (quoting *A-B-II*, 28 I. & N. Dec. at 200).

[42] **ECF 1.**

[43] 467 U.S. 837 (1984).

agency, must give effect to the unambiguously expressed intent of Congress.[44] "On the other hand, 'if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'"[45] When interpreting the INA, "the BIA should be afforded *Chevron* deference as it gives ambiguous statutory terms 'concrete meaning through a process of case-by-case adjudication.'"[46] "The reasonableness of an agency's statutory interpretation is dependent in part on the consistency with which the interpretation is advanced."[47]

Whether a petitioner's proffered particular social group "is cognizable 'presents a mixed question of law and fact, since the ultimate legal question of cognizability depends on underlying factual questions concerning the group and the society of which it is a part.'"[48] Therefore, we "review de novo the ultimate legal conclusion as to the existence of a [PSG]" but "review the underlying factual findings for substantial evidence."[49]

A. Cancellation of Removal

Avila challenges the BIA's determination that a New Jersey disorderly persons offense is a conviction for immigration purposes. While Avila's petition for review was pending, the BIA issued its precedential decision in *Matter of S. Wong*,[50] which held that a New Jersey disorderly persons offense *was* a conviction of a crime for immigration purposes. We must now determine the amount of deference, if any, owed to that decision. If *Wong* controls our analysis, Avila has more than one conviction for crimes involving moral turpitude, and is statutorily ineligible for relief from removal. If it is not a

---

[44] *See Acosta v. Ashcroft,* 341 F.3d 218, 222 (3d Cir. 2003).

[45] *Id.* (quoting *Chevron,* 467 U.S. at 843).

[46] *Id.* (quoting *INS v. Aguirre–Aguirre,* 526 U.S. 415, 425 (1999)).

[47] *Castillo*, 729 F.3d at 302 (citing *Valdiviezo–Galdamez v. Att'y Gen.,* 663 F.3d 582, 604 (3d Cir. 2011)).

[48] *Chavez-Chillel.* 20 F. 4th at 146 (quoting *S.E.R.L. v. Att'y Gen.*, 894 F.3d 535, 543 (3d Cir. 2018)).

[49] *S.E.R.L.*, 894 F.3d at 543.

[50] 28 I. & N. Dec. 518, 525 (BIA 2022).

conviction for immigration purposes, Avila could avoid a finding of inadmissibility under the petty offense exception contained in INA § 212(a)(2)(A)(ii), 8 U.S.C. §1182(a)(2)(A)(ii).

Section 1101(a)(48)(A) of the INA defines the "conviction" as follows:

> The term "conviction" means, with respect to a [noncitizen,] a formal judgment of guilt of the [noncitizen] entered by a court or, if adjudication of guilt has been withheld, where—
>
> (i) a judge or jury has found the [noncitizen] guilty or the [non-citizen] has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and
>
> (ii) the judge has ordered some form of punishment, penalty, or restraint on the [noncitizen's] liberty to be imposed.

Both our court and the BIA have acknowledged that § 1101(a)(48)(A) is ambiguous at step one of *Chevron*'s two-step analysis.[51] Accordingly, we move to *Chevron*'s second step and ask whether the BIA's construction of § 1101(a)(48)(A) in *Wong* is permissible.[52] Avila argues that the agency's interpretation of that statute is impermissible because it "significant[ly] depart[ed]" from the Board's precedent in

---

[51] *See Matter of Eslamizar*, 23 I & N Dec. at 686–87; *Castillo*, 729 F.3d at 306. At step one of the *Chevron* analysis, we ask whether "Congress has directly spoken to the precise question at issue." *Egan v. Del. River Port. Auth.*, 851 F.3d 263, 269 (3d Cir. 2017) (citing *Chevron*, 467 U.S. at 842). If we "determine that Congress has not addressed 'the precise question at issue,' whether by being 'silent or ambiguous with respect to the specific issue' or by leaving 'a gap for the agency to fill,' then we must proceed to the second step and determine whether the agency's construction of the statute is reasonable." *Helen Mining Co. v. Elliott*, 859 F.3d 226, 234 (3d Cir. 2017) (citing *Chevron*, 467 U.S. at 843–44).

[52] *Helen Mining Co.*, 859 F.3d at 236-37.

*Eslamizar* and our precedent in *Castillo* "while failing to announce a principled reason for such departures."[53]

In *Eslamizar*, the BIA concluded that the definition of "conviction" under § 1101(a)(48)(A) is unclear. It attempted to resolve the ambiguity by adopting what it considered "a far more sensible reading of the statute."[54] The BIA reasoned that, "by 'judgment of guilt,' Congress most likely intended to refer to a judgment *in a criminal proceeding*, that is, a trial or other proceeding whose purpose is to determine whether the accused committed a crime and which provides the constitutional safeguards normally attendant upon a criminal adjudication."[55] The BIA determined in *Eslamizar* that a judgment of guilt of third-degree theft under Oregon law did not qualify as a conviction under § 1101(a)(48)(A).[56] In reaching that conclusion, the BIA considered—among other factors—that the respondent was convicted under a lower standard than proof beyond a reasonable doubt.[57] The BIA also considered that the Oregon law did not classify the offense as criminal.[58]

We subsequently examined that reasoning in *Castillo*.[59] There, we rejected the BIA's argument that *Eslamizar* established that "a finding of guilt constitute[s] a conviction under § 1101(a)(48)(A)" so long as each element of the offense was proven beyond a reasonable doubt.[60] Instead, we agreed with Castillo's contention that the "more persuasive interpretation of *Eslamizar* and § 1101(a)(48)(A)" was that the decision-maker should conduct an "open-ended inquiry."[61]

---

[53] Pet'r Br. at 13.

[54] *See Matter of Eslamizar*, 23 I & N Dec. at 687.

[55] *Id.*

[56] *Id.* at 689.

[57] *Id.* at 687–88.

[58] *Id.* at 688.

[59] *Castillo*, 729 F.3d at 304–5.

[60] *Id*. at 300-01, 305. "As we noted in *Castillo*, that each element must be proven beyond a reasonable doubt is a necessary but not sufficient condition for a proceeding to qualify as a 'genuine criminal proceeding.'" *Gourzong v. Att'y Gen.*, 826 F.3d 132, 139 n.4 (3d Cir. 2016) (citing *Castillo*, 729 F.3d at 307).

[61] *Castillo*, 729 F.3d at 306–7.

That inquiry was necessary to determine if the judgment of guilt was "entered in a true or genuine criminal proceeding—and therefore [constituted] a conviction pursuant to § 1101(a)(48)(A)."[62] We explained that the open-ended inquiry must also consider "how the prosecuting jurisdiction characterized the offense at issue, the consequences of a finding of guilt, and the rights available to the accused as well as any other characteristics of the proceeding itself."[63] We examined some of the BIA's post-*Eslamizar* decisions which considered multiple factors in determining whether a judgment of guilt was "entered in a true or genuine criminal proceeding."[64] In doing so, we noted that "two unpublished single-member decisions addressing shoplifting offenses under New Jersey law" conflicted with a "general 'criminal proceeding' approach" and simply concluded that offenses were convictions pursuant to § 1101(a)(48)(A) because the noncitizens were found guilty beyond a reasonable doubt.[65] Given the BIA's "erratic" and "irreconcilable" interpretations, we refused to accord *Chevron* deference to the Board's construction of "conviction" as articulated in *Eslamizar*.[66]

We then remanded *Castillo* back to the agency and directed it to try "to clarify *Eslamizar* and the agency's reading" of § 1101(a)(48)(A)."[67] We explained that the

---

[62] *Id.* at 307. *See Gourzong*, 826 F.3d at 138–39 (quoting *Castillo*, 729 F.3d at 307) ("[W]e rejected a narrow approach that looked only to a single factor. . .and instead adopted an 'open-ended inquiry' as to whether the judgment of guilt was 'entered in a. . . genuine criminal proceeding.'").

[63] *Id.* at 307.

[64] *Id.* at 307-09 (discussing *In re Bajric,* 2010 WL 5173974 (BIA Nov. 30, 2010); *In re Rivera-Valencia,* 24 I. & N. Dec. 484 (BIA 2008); and *In re Cuellar-Gomez*, 25 I. & N. Dec. 850 (BIA 2012)).

[65] *Castillo*, 729 F.3d at 309–310 (citing *See In re Delgado,* A13 924 138, 2008 WL 762624 (BIA Mar. 11, 2008) (unpublished decision), *petition for review denied sub nom. Delgado v. Attorney General,* 349 Fed. Appx. 809 (3d Cir. 2009) (per curiam); *In re Dilone,* A44 476 837, 2007 WL 2463936 (BIA Aug. 6, 2007) (unpublished decision).

[66] *Castillo*, 729 F.3d at 309–11.

[67] *Id.* at 311.

"agency [wa]s free to reconsider the problematic opinion [in *Eslamizar*], provided that it state[d] a reasoned explanation for doing so."[68] Otherwise, we directed the BIA to apply an open-ended inquiry guided by the factors we had identified.[69]

This "open-ended inquiry" remained the governing standard until the BIA issued its decision in *Wong*. There, the BIA reexamined "the circumstances under which a proceeding not denominated as 'criminal' under the laws of the [prosecuting] jurisdiction . . .can nonetheless result in a 'conviction'" under § 1101(a)(48)(A).[70] In *Wong,* the BIA observed that Courts of Appeals had "taken divergent approaches to *Matter of Eslamizar* and its progeny[.]" The Eighth Circuit had declined to follow our decision in *Castillo.*[71] The Eighth and Tenth Circuits interpreted *Eslamizar* "more narrowly" than the Second Circuit or our court.[72] Accordingly, in *Wong*, the BIA sought to "clarify the conditions that make a State proceeding criminal in nature for purposes of" § 1101(a)(48)(A).[73]

*Wong* began by explaining that "whether a conviction exists for purposes of a federal statute is a question of federal law and should not depend on the vagaries of state law."[74] Although a State's classification "of offenses as 'crimes'" may be helpful "in identifying substantive rights and disabilities that flow from that categorization ,. . . [that] categorization

---

[68] *Id.*
[69] *Id.*
[70] *Wong*, 28 I. & N. Dec. at 518.
[71] *Rubio v. Sessions*, 891 F.3d 344, 349 (8th Cir. 2018) ("we decline to follow [*Castillo*, 729 F.3d at 302-11].").
[72] *Wong*, 28 I. & N. Dec. at 523. *See Rubio*, 891 F.3d at 350 ("the most fundamental aspect of a 'criminal proceeding' in this country is whether 'guilt' was proved beyond a reasonable doubt"); *Batrez Gradiz v. Gonzales,* 490 F.3d 1206, 1208 (10th Cir. 2007) ("*Eslamizar* does nothing more than reaffirm our traditional standard that findings of guilt must be beyond a reasonable doubt.").
[73] *Wong*, 28 I. & N. Dec. at 523.
[74] *Id.* at 523 (citing *Matter of Ozkok*, 19 I. & N. Dec. 546, 551 n.6 (BIA 1988)).

itself is not dispositive."[75] In other words, it is "the substance of the proceeding, not the label the State assigns to it" that is relevant to whether a "proceeding results in a criminal conviction for immigration purposes."[76]

*Wong* instructs that the critical inquiry in determining the substance of the proceeding is whether it requires "minimum constitutional safeguards."[77] A proceeding is only "criminal in nature," and thus can only constitute a conviction under § 1101(a)(48)(A), where the individual was afforded the "rights of criminal procedure guaranteed by the Constitution— as incorporated against the States by virtue of the Fourteenth Amendment."[78] Such constitutional protections include "proof beyond a reasonable doubt; and the rights to confront one's accuser, a speedy and public trial, notice of the accusations, compulsory process for obtaining witnesses in one's favor, and against being put in jeopardy twice for the same offense."[79] The absence of these protections "renders the proceeding noncriminal for Federal purposes."[80]

Although the relevant inquiry is whether a proceeding requires "minimum constitutional safeguards," the BIA explained that because "[s]ome rights are contingent," the absence of those rights will not determine whether a proceeding is criminal in nature.[81] For instance, because the "right to a jury trial applies only if the charged offense is deemed 'serious,' and the right to counsel applies only if a conviction can result in the loss of liberty," the conclusion that a proceeding is criminal will not turn on those rights.[82]

---

[75] *Id.* at 523.

[76] *Id.* (citing *Rubio*, 891 F.3d at 351), 526.

[77] *Id.* at 525.

[78] *Id.* at 524.

[79] *Id.* at 523–24.

[80] *Id.* at 524.

[81] *Id.*

[82] *Id.* (citing *Lewis v. United States*, 518 U.S. 322, 325 (1996); *Duncan v. Louisiana*, 391 U.S. 145, 157-59 (1968); *Alabama v. Shelton*, 535 U.S. 654, 661 (2002); *Scott v. Illinois*, 440 U.S. 367, 374 (1979)).

The BIA then assessed a New Jersey disorderly persons offense using this standard. It concluded that, because "New Jersey provides all of the constitutionally-mandated rights of criminal procedure" including "proof beyond a reasonable doubt,. . . the "right[] to confront one's accuser, a speedy and public trial, notice of the accusations, compulsory process for obtaining witnesses in one's favor, and against being put in jeopardy twice for the same offense," New Jersey disorderly persons offenses are criminal convictions for immigration purposes.[83]

In deferring to the BIA's assessment of this New Jersey statute and § 1101(a)(48)(A), we need not conclude that the BIA's construction "was the only one it permissibly could have adopted."[84] Nor do we ask "whether it is the best possible interpretation of Congress's ambiguous language. Instead, we. . .only inquire whether the BIA made 'a reasonable policy choice' in reaching its interpretation."[85] Because the Board's interpretation of § 1101(a)(48)(A) is "a reasonable reading of the text and a reasonable policy choice," we conclude that *Wong* is entitled to *Chevron* deference.[86]

Although *Wong* departed from the BIA's prior decisions requiring that the offense be "criminal in nature under the governing laws of the prosecuting jurisdiction,"[87] it "display[ed] awareness" that it was changing its position[88] and

---

[83] *Wong*, 28 I. & N. Dec. at 523–24, 527–28.

[84] *Chevron*, 467 U.S. 843. n.11.

[85] *Mejia-Castanon v. At*t'*y Gen.*, 931 F.3d 224, 235–6 (3d Cir. 2019) (*citing Am. Farm Bureau Fed'n v. E.P.A.* 792 F.3d 281, 295 (3d Cir. 2015) (internal quotations omitted).

[86] *Id*. at 236.

[87] *Eslamizar*, 23 I. & N. Dec. at 688.

[88] *S.E.R.L.*, 894 F.3d at 551 n. 16 (citing *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (the Supreme Court has acknowledged that, where an agency must change its policy, it must 'display[] awareness that it is changing position' and 'provide a reasoned explanation' for the change.'")).

14

"announc[ed] a principled reason for this departure.[89] It explained that a focus on:

> whether the State adjudication is a substantively constitutional criminal proceeding [using the guarantees provided in the Constitution] avoids improper reliance on State definitions and categories. It also avoids the potential for tautological reasoning that a particular proceeding is criminal in nature because it is labeled as such under the laws of the prosecuting jurisdiction, without establishing what conditions make a procedure "criminal" in the first place. *See Castillo*, 729 F.3d at 302 ("[O]ne must still ask 'conviction' of what.").[90]

That analysis is reasonable. We have long held that a state legislature cannot "dictate how the term 'conviction' is to be construed under federal law."[91] Moreover, a focus on constitutional protections establishes a clear test that promotes uniformity. The test ensures that non-citizens will be treated uniformly regardless of the state of their conviction because "substantive constitutionality will not vary from State to State."[92] The resulting uniformity "enabl[es] agencies to avoid the difficulty of enforcing different rules depending on the jurisdiction."[93] Moreover, since the new test for determining what constitutes a "conviction" under § 1101(a)(48)(A) is tethered to the procedural safeguards mandated by the U.S. Constitution, it is not arbitrary or capricious.

Avila's argument that the Board failed to adhere to our holding in *Castillo* is unavailing. *Castillo* did not require the Board to conduct an "open-ended inquiry," as Petitioner

---

[89] *Valdiviezo-Galdamez*, 663 F.3d at 608 (citing *Johnson v. Ashcroft,* 286 F.3d 696, 700 (3d Cir. 2002)).

[90] *Wong*, 28 I. & N. Dec. at 524–25 (internal citations omitted).

[91] *See Acosta*, 341 F.3d at 223.

[92] *See Wong*, 28 I. & N. at 525.

[93] *Hagans v. Comm'r of Soc. Sec*. 694 F.3d 287, 294 (3d Cir. 2012). *See also U. S. v. Mead Corp.,* 533 U.S. 218, 220 (2001) (discussing "the value of uniformity in…administrative and judicial understandings of what a national law requires.").

contends.[94] Instead, *Castillo* provided the Board with an option—either conduct an "open-ended inquiry" *or* reconsider its "problematic opinion" in *Eslamizar.* Petitioner argues that although the Board could reinterpret § 1101(a)(48)(A), we stated in *Castillo* that "at the very least" the following factors should be considered when determining whether a person committed a crime for immigration purposes: (1) "how the prosecuting jurisdiction characterized the offense at issue"; (2) "the consequences of a finding of guilt"; (3) "the rights available to the accused"; and (4) "any other characteristics of the proceeding itself."[95] However, Petitioner misunderstands our holding in *Castillo.* We reasoned in *Castillo* that *if* the Board was applying an "open-ended multi-factor analysis," as we interpreted the test set forth in *Eslamizar*, these factors "appeared to be relevant."[96] Nowhere did we state the Board must cling to those factors if it established a new test. Because the Board has redefined the test for determining if or when a person is convicted of a crime for immigration purposes, *Wong* does not conflict with our reasoning in *Castillo.*

We realize that, although *Wong* warned against "improper reliance on State definitions and categories," the Board did not hold that State categorizations were irrelevant.[97] Instead, the Board reasoned that "whether and in what contexts a State classifies offenses as 'crimes' may assist Immigration Judges in identifying substantive rights and disabilities that flow from that categorization, but the categorization itself is not dispositive."[98] However, we interpret this as nothing more than stating that a decision-maker may look to a jurisdiction's classification of a given offense as an aid to determining the constitutional protections that flow from it. Thus, in the final analysis, the Board's decision in *Wong* is neither unreasonable nor in conflict with our precedent. Accordingly, it controls our

---

[94] Pet'r Br. at 7.

[95] *Castillo*, 729 F.3d at 306–7 (citing *Eslamizar*, 23 I&N Dec. at 687). **Pet'r Br. at 16–17.**

[96] *Id.* at 307.

[97] *Wong*, 28 I. & N. Dec. at 524.

[98] *Id*. at 523.

analysis here, and we must deny the petition for review on this claim.

## A. Asylum Claim

Asylum may be granted to a removable noncitizen if she demonstrates that she is "unable or unwilling to return to, and is unable or unwilling to avail [herself] . . . of the protection of, [the country to which she would be removed] because of persecution or a well-founded fear of persecution on account of . . . membership in a particular social group."[99]

A particular social group (PSG) must be: "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question."[100] At the time that the BIA issued its decision denying Avila's asylum claim, *Matter of A-R-C-G-* was binding law and the most instructive case on whether Avila's PSG was cognizable. That decision had previously been overruled in *A-B-I* which held that claims by noncitizens "pertaining to domestic violence. . . perpetrated by a non-governmental actor will not qualify for asylum."[101] However,

---

[99] 8 U.S.C. § 1101(a)(42)(A); *see also id*. § 1158(b)(1)(B)(i). The government argues that Avila is barred from asylum because of the "criminal alien bar," but provides no citations to support that assertion. Respondent Br. at 3. A non-citizen is barred from asylum if she is convicted of a "particularly serious crime," including aggravated felonies. 8 U.S.C. § 1158(b)(2)(A)(ii), *Id.* § 1158(b)(2)(B)(i). Given that Avila received a gubernatorial pardon for her Delaware felony conviction, **A.R. 403-54,** and the IJ found that this conviction was not categorically an aggravated felony, and thus that she could pursue her asylum application, **A.R. 395-402,** there is nothing in the record indicating that Avila's criminal convictions are for a "particularly serious crime."

[100] *Matter of M-E-V-G-*, 26 I. & N. Dec. at 237.

[101] 27 I. & N. Dec. at 320. Following that decision, the Attorney General issued *Matter of A-B-*, 28 I. & N. Dec. 199 (A.G. 2021) (*A-B-II*), in which the Board "reviewed a subsequent Board decision in the same case 'to provide additional guidance' on recurring issues in asylum cases involving 'applicants who claim persecution by non-

in *A-B-III*, issued in 2021 *before* the BIA issued its decision denying Avila's appeal, the Attorney General held that "*A-B-I and A-B-II* should be vacated in their entirety" and "immigration judges and the Board should follow pre-*A-B-I* precedent, including *Matter of A-R-C-G-*."[102]

In *Matter of A-R-C-G-*, the BIA held that "married women in Guatemala who are unable to leave their relationship" can constitute a cognizable PSG that forms the basis for asylum.[103] In its decision, the BIA held that "any claim regarding the existence of a particular social group in a country must be evaluated in the context of the evidence presented regarding the particular circumstances in the country in question."[104] The BIA noted that terms such as "married," "women," and "unable to leave the relationship" "can combine to create a group with discrete and definable boundaries" depending on societal expectations about gender and subordination, as well as "religious, cultural, or legal constraints" about "divorce and separation."[105] In evaluating "social distinction," the BIA again looked to country-specific evidence including whether "Guatemalan society . . . recognizes the need to offer protection to victims of domestic violence, . . . has criminal laws designed to protect domestic abuse, whether those laws are effectively enforced, and other sociopolitical factors."[106] The BIA then pointed to evidence in the record about Guatemala's "culture of 'machismo and family violence'" and the country's failure "to prosecute domestic violence crimes," or to "respond to requests for assistance" from domestic violence survivors.[107] That evidence in the record, the BIA concluded, "support[ed] the existence of social distinction."[108]

---

governmental actors on account of the applicant's membership in a particular social group.'" *A-B-III*, 28 I. & N. Dec. at 308 (quoting *A-B-II*, 28 I. & N. Dec. at 200).

[102] *A-B-III*, 28 I. & N. Dec. at 309.

[103] 26 I. & N. Dec. at 390.

[104] *Id.* at 392.

[105] *Id.* at 393 (citations omitted).

[106] *Id.* at 394.

[107] *Id.* at 394 (internal citation omitted).

[108] *Id.*

Here, on the other hand, the BIA did not adhere to *Matter of A-R-C-G-*'s requirement to examine Avila's PSG within the context of the specific country conditions in Honduras. The BIA rejected Avila's PSG for lack of particularity without considering evidence in the record about "widespread and systemic violence" against Honduran women, "inconsistent legislation implementation, gender discrimination within the justice system, and lack of access to services."[109] Evidence in the record, including that "[l]ess than one in five cases of femicide are investigated,… and the average rate of impunity for sexual violence and femicide is approximately 95%," may have been relevant in examining whether Avila's proposed PSG was cognizable.[110] Just as the cultural attitudes toward gender were relevant in *Matter of A-R-C-G-*, evidence in the record as to the "machismo culture" in Honduras may be relevant to assessing whether Avila has a cognizable PSG.[111]

Moreover, in *Matter of A-R-C-G-*, DHS conceded that the proposed group "married women in Guatemala who are unable to leave their relationship" was sufficient for a PSG asylum claim.[112] Given the similarity between that social group and "Honduran women in a domestic relationship where the male believes that women are to live under male domination," we must remand for the BIA to provide clarification as to its application of *Matter of A-R-C-G-*, and to determine whether Avila's proposed PSG is cognizable in light of the specific country conditions.

We must also remand for the BIA to consider whether Avila demonstrated a well-founded fear of persecution on account of her PSG. The BIA determined that Avila's PSG did not "exist independently" of the harm alleged, as required under *Matter of M-E-V-G-*[113] and *Matter of W-G-R-*.[114] *Matter of M-E-V-G-* cites to this Court's prior precedent in *Lukwago*

---

[109] A.R. 157, 158.

[110] A.R. 158.

[111] A.R. 157 (internal citation omitted).

[112] *Matter of A-R-C-G-*, 26 I. & N. Dec. at 392, 393, 395.

[113] 26 I. & N. Dec. at 237 n. 11.

[114] 26 I. & N. Dec. at 215.

*v. Ashcroft*,[115] which states that a PSG "must exist independently of the persecution suffered by the applicant for asylum."[116] However, *Lukwago* makes clear that in determining whether a PSG exists independently of the persecution suffered, the BIA must consider the PSG in the context both of "past persecution" and a "well-founded fear of persecution."[117] Here, the BIA did not consider whether Avila had demonstrated that she had a well-founded fear of persecution based on her past experiences of abuse and sexual violence. Accordingly, we will remand for the BIA to consider, in addition to whether Avila has suffered past persecution on account of her PSG, whether she has demonstrated a well-founded fear of future persecution.

In conclusion, on remand, the BIA should (1) clarify, given the Government's concession in *Matter of A-R-C-G-* that the proposed group was sufficient for a PSG asylum claim, its application of *Matter of A-R-C-G-* to the present case, and consider Avila's PSG in the context of evidence presented about the country conditions in Honduras and (2) provide guidance in applying both *Matter of A-R-C-G-* and *Matter of M-E-V-G-* with respect to past persecution *and* a well-founded fear of future persecution on account of membership in a PSG.

### III.

Because we must defer to *Wong's* interpretation of §1101(a)(48)(A), we conclude that Avila's disorderly persons offense constitutes a criminal conviction for immigration purposes. Accordingly, we must deny Avila's petition for review on that claim. However, as to Avila's asylum claim, we will grant her petition for review, vacate the BIA's order and

---

[115] 329 F.3d 157 (3d Cir. 2003).

[116] *Id.* at 172.

[117] *Id.* at 174; *see also* 8 U.S.C. § 1101(a)(42)(A). As our Court explained in *Lukwago*, even if Avila "fails to demonstrate past persecution[, she] may still qualify for asylum by showing that s/he has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion if returned to. . . her native country." *Id.* at 174.

remand to the BIA for further proceedings consistent with this opinion.